# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


ST. LUKE'S CATARACT and LASER   )
INSTITUTE, P.A.,                )
                                )
                Plaintiff,      )
                                )
           -vs-                 )   No. 8:06cv223-T26MSS
                                )
JAMES C. SANDERSON, JAMES C.    )
SANDERSON, M.D., L.L.C., and MARK)
ERICKSON,                       )
                                )
                Defendant.      )



          Deposition of JAMES T. BERGER taken before

ROBBIN M. OCHENKOWSKI, C.S.R., and Notary Public,

pursuant to the Federal Rules of Civil Procedure for the

United States District Courts pertaining to the taking

of depositions, at Suite 1900, 200 West Adams Street, in

the City of Chicago, Cook County, Illinois at 9:15 p.m.

on the 15th day of March, A.D., 2007.

          There were present at the taking of this

deposition the following counsel:

Page 2

```
1   PRESENT:
2
3       ALSTON & BIRD, L.L.P.
        by MR. DAVID J. STEWART
        One Atlantic Center
4       1201 West Peachtree Street
        Atlanta, Georgia 30309-3424
5       (404) 881-7000
6         on behalf of the Plaintiff;
7       LOWIS & GELLEN, L.L.P.
        by MR. ROBERT H. SMELTZER
8       200 West Adams Street
        Suite 1900
9       Chicago, Illinois 60606
        (312) 364-2500
10
        on behalf of the Defendants
11      James C. Sanderson, James C. Sanderson, M.D.,
        L.L.C.
12
13
                - - - - -
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1       (Discussion had off the record.)
2       THE VIDEOGRAPHER:  And good morning.  We're going on
3   the video record at 9:12, and today's date is
4   March 15th, 2007.
5       My name is Robert Zellner, and I'm a legal
6   videographer in association with Merrill Legal
7   Solutions.
8       The court reporter today is Robbin Ochenkowski.
9       Here begins the videotape deposition of
10  James T. Berger taken in the matter of St. Luke's
11  Cataract and Laser Institute, P.A. versus James C.
12  Sanderson, et. al., bearing Case No. 8:06cv223-T26MSS in
13  the United States District Court for the Middle --
14  Middle District of Florida, Tampa Division.
15      This deposition is being held at 200 West Adams
16  Street in Chicago, Illinois, and is being taken on
17  behalf of the plaintiff.
18      And will the attorneys please identify
19  themselves for the record and state whom you represent
20  starting with the noticing party?
21      MR. STEWART:  David Stewart with Alston & Bird
22  representing the plaintiff in the case, St. Luke's
23  Cataract and Laser Institute.
24      MR. SMELTZER:  And Robert Smeltzer here on behalf of
```

Page 3

```
1           DEPOSITION OF
            JAMES T. BERGER
2
            March 15, 2007
3
4   EXAMINATION BY:                    PAGE
5   Mr. David J. Stewart                  5
6   Mr. Robert H. Smeltzer              208
7   Mr. David J. Stewart                220
8   Mr. Robert H. Smeltzer              227
9
10
11          * * * * * *
12
13          EXHIBITS
14                              PAGE
15  Deposition Exhibit 1            6
    Deposition Exhibit 2           49
16  Deposition Exhibit 3           51
    Deposition Exhibit 4           53
17  Deposition Exhibit 5          120
    Deposition Exhibit 6          158
18  Deposition Exhibit 7          172
    Deposition Exhibit 8          175
19  Deposition Exhibit 9          192
    Deposition Exhibit 10         192
20  Deposition Exhibit 11         207
21
22
23          * * * * * *
24
```

Page 5

```
1   Defendants James C. Sanderson and James C. Sanderson,
2   L.L.C.
3       THE VIDEOGRAPHER:  Thank you.
4       Will the court reporter please swear in the
5   witness?
6           (Witness first duly sworn.)
7           JAMES T. BERGER,
8   called as a witness herein, having been first duly
9   sworn, was examined upon oral interrogatories and
10  testified as follows:
11              EXAMINATION
12          by Mr. Stewart:
13  Q   Good morning, Mr. Berger.
14  A   Good morning --
15  Q   We --
16  A   -- Mr. Stewart.
17  Q   We have not met before today, have we?
18  A   No, we have not.
19  Q   We have not communicated in any way before
20  today, have we?
21  A   No, we have not.
22  Q   Are you on any medication or under the influence
23  of any other substance that might affect your ability to
24  understand my questions and respond to them this
```

Page 106

1    A   Some states had higher median ages, and some
2  states had lower median ages, and I believe the
3  variation was a high of 42 and a low of 28, which to me
4  seemed like a pretty significant difference.
5    Q   Does that impact your opinions at all in this
6  case?
7    A   Does it?
8        No.
9    Q   Do you remember what it said about Florida?
10   A   Yes, I do.
11       Florida was -- was among the highest in median
12  age, not the highest, but among the highest.
13       I believe it was 39.5 was the median age of
14  Florida.
15   Q   Why is it that you consider this article
16  relevant to this case?
17   A   I believe there was some conversation in the --
18  in the critiques of my survey about the fact that people
19  are the same everywhere around the country, and I
20  believe it was my contention that Florida was not
21  typical of the rest of the country, and this particular
22  piece of information shows to me that Florida is indeed
23  not typical of the rest of the country.
24   Q   All right.  I want to continue talking about

Page 107

1  documents that you have reviewed in connection with this
2  case or that you believe are relevant to this case since
3  the date of your opinion.
4    A   Okay.  There are sources.
5    Q   And so we've talked about the AARP document.
6        It sounds like you may have reviewed a
7  supplemental report from one of St. Luke's experts?
8    A   Yes.
9        I've reviewed -- There were three different --
10       I should have mentioned this.  I'm sorry.
11       There were three different critiques of my
12  report by Mr. Hollander, Mr. Dawes and Mr. -- whatever
13  the third guy's name is, and I reviewed those, Pellman,
14  Pellman, Pellman, Dawes and Hollander.
15   Q   Have you reviewed any other documents?
16   A   I don't believe so.
17   Q   Have you reviewed the transcripts of any
18  depositions taken --
19   A   No --
20   Q   -- in this case?
21   A   -- I haven't.  No, I haven't.
22   Q   Have you discussed the depositions of any other
23  witnesses in this case with anyone?
24   A   No.

Page 108

1    Q   No discussion yesterday about other depositions
2  taken?
3    A   No.
4    Q   Would you agree with me, Mr. Berger, that a
5  survey question that asks how did you hear about Product
6  X tests a different issue than the question what
7  influenced your decision to buy Product X?
8    A   Yes.
9    Q   Have you done any research or studies on the
10  effectiveness of Internet marketing?
11   A   Not on the effectiveness of it, no.
12   Q   Have you done any research or studies on
13  Internet marketing?
14   A   Yes, one of them.
15   Q   What have you done, and what was the --
16   A   Cases --
17   Q   -- nature?
18   A   -- we talked about.
19       Excuse me.  I'm sorry.  I interrupted you
20  again.
21       The cases that we talked about today, there
22  were a number of them and involved with the Internet.
23   Q   I -- I guess my question is focused more on
24  marketing done by companies to promote their goods and

Page 109

1  services.
2        Is that something that you studied or
3  researched, how -- how effective the Internet is in use
4  by companies to promote their goods or services?
5    A   Only what I talked about in my report.
6        And there was a thing that I alluded to that
7  showed various companies and the effect of the Internet
8  on the -- on their particular products.
9    Q   Okay.  But that's not something that you have
10  independently studied?
11   A   No, I have not.
12   Q   And so you really could not then hold yourself
13  out as an expert on Internet marketing?
14   A   I'm an expert on marketing communications, okay?
15  And that involves a variety of different things, the
16  Internet being one of them, so I would not like to close
17  myself off and say that I'm not, but at the same time I
18  will answer to the affirmative that I have never done a
19  study myself to gauge the effectiveness of Internet
20  marketing.
21   Q   A minute ago when you mentioned a couple of
22  things that are referenced in your report, your report
23  that talks about the effectiveness of Internet marketing
24  to particular goods or services, are those the articles

Page 158

1  not sure.
2      I mean, if I can see the --
3      You want to show me a copy of the thing?
4  I'll --
5  Q  Well, did you base your opinion off the
6  understanding of the survey that you just --
7  A  No. I base --
8  Q  -- quoted?
9  A  I base my opinion on the actual wording that was
10  on the questionnaire.
11     I don't -- Yeah.
12  Q  Well, hang on just a second.
13  A  Oh, okay.
14  Q  The court reporter needs to mark it.
15  THE REPORTER:  6.
16     (Document marked.)
17  MR. STEWART:  Q  I'm going to hand you Exhibit 6 and
18  ask if that's a document you can identify.
19  A  Yes.
20  Q  What is Exhibit 6?
21  A  It says -- It's a questionnaire. It says,
22  Please take a moment to tell us how you heard about
23  Dr. Sanderson.
24  Q  Is that the same thing as asking what caused

Page 159

1  them to come see Dr. Sanderson?
2  A  No.
3     It's asking how they heard about Dr. Sanderson.
4  Q  Which tests something very different?
5  A  Different, not very different.
6     You know, I mean, we're -- we're splitting
7  hairs on this.
8  Q  If you were asking a patient what influenced
9  them to come see Dr. Sanderson, this is not the question
10  you would use, is it?
11  A  Might be.
12  Q  It might be?
13  A  Yeah, it might be.
14     How did you hear about me?
15     Somebody has come in -- come into the office or
16  schedule an appointment, and you ask them how you heard
17  about me.
18  Q  My question is, you as a trained survey expert
19  person who holds you out -- yourself out as an expert in
20  the field of survey research, if you wanted to determine
21  what influenced patients to come see Dr. Sanderson, the
22  question you would ask is, tell me how you heard about
23  Dr. Sanderson?
24  A  I don't know the specific question that I would

Page 160

1  ask, and, generally, when I do this kind of thing, I
2  think it through very, very carefully, and I have not
3  thought this through carefully.
4     This is a fact. This is what was given to
5  these people.
6     I had no input on it. I had nothing to do with
7  it.
8     Would I have asked it the same way? I don't
9  know. I might have. I might not have.
10  Q  One of the things that you do as a survey
11  expert, I assume, is to pay careful attention to how a
12  question is worded in a survey?
13  A  That's correct.
14  Q  And one of your goals is to reduce as much as
15  possible any ambiguity that there may be in a question?
16  A  You try to.
17  Q  And if there's ambiguity in a question, it could
18  lead to results that are inconsistent?
19  A  (Indicating.)
20  Q  And It could lead --
21     I'm sorry?
22  A  Yes.
23  Q  And it could lead to results that in fact don't
24  provide legitimate evidence on the topic that you're

Page 161

1  trying to research?
2  A  That's possible.
3  Q  Is it possible that patients who read this
4  survey, Please take a moment to tell us how you heard
5  about Dr. Sanderson, that a patient could read that to
6  say, tell me how you -- how I first heard about
7  Dr. Sanderson?
8  A  No.
9  Q  You don't think there's any way a -- a pa -- a
10  consumer could read it that way?
11  A  I think they can read it the way it's -- the way
12  it's written.
13  Q  What does the phrase how you heard about
14  Dr. Sanderson mean to you?
15  A  Exactly -- Exactly the way it's -- the way
16  it's -- it's said, how you heard about somebody.
17  I -- I couldn't put any more into that than
18  what's there.
19  Q  So you don't have an opinion about what that
20  means?
21  A  It means exactly what it is intended to mean;
22  how did you -- how did you hear about Dr. Sanderson.
23  It didn't -- It doesn't say, how did you first
24  hear of Dr. Sanderson. It says, how did you hear of

Page 166

1    A  You said, is it possible that no single person
2  would look at that and say that.
3        I -- I don't have a clue.
4    Q  Well, good.
5    A  I don't know how people process information in
6  that way.
7        But the way it is written is very clear in my
8  mind where it says, Please take a minute and tell us how
9  you heard about Dr. Sanderson.
10        It doesn't say, and I have given surveys that
11  say how you first heard or I've given surveys that said
12  the number one reason why you select it.  Those are all
13  legitimate ways of asking questions.  This asked a
14  question in a legitimate way, and that's the -- that's
15  the answer you got.
16    Q  This survey does not in any way though attempt
17  to measure whether the Internet influenced the patient's
18  decision to come to see Dr. Sanderson though, right?
19        And I think I may have asked that previously.
20  If so, I apologize --
21    MR. SMELTZER:  Asked on and answered.
22    MR. STEWART:  -- re-covering ground.
23    THE WITNESS:  A  It cer -- All it does is ask people
24  to indicate how they heard about Dr. Sanderson.  It's as

Page 167

1  clear as can be.
2    MR. STEWART:  Q  Okay.  Do you know if patients have
3  made a purchasing decision at the time the survey is
4  completed?
5    A  I don't believe they have committed to -- Based
6  on my conversation with Dr. Sanderson yesterday, I don't
7  believe at the time they fill out this survey they have
8  committed to the work.
9        They have come into the office, they have met
10  with Dr. Sanderson, and before they leave or in the
11  process of waiting to see him, they are given this
12  survey, and that's when that -- so -- so it's not a --
13  it's not done after somebody has had the work done and
14  paid the bill.
15    Q  And the patient might very well go to the
16  website after they complete this form, correct?
17    A  Yes.
18    Q  And might be influenced to choose Dr. Sanderson
19  because of that visit to the website?
20    A  Could very well be.  I'll knowledge that.
21    Q  I'm going to go back to Paragraph 10 of your
22  report.
23        We were discussing the fact earlier that you
24  note that Mr. Pellman had failed to offer specific

Page 168

1  empirical evidence on two topics.
2        One we've talked about already.
3        The second one is, how significant was the
4  Internet in steering patients to Dr. Sanderson."
5        Do you have any evidence of how significant the
6  Internet was in steering patients to Dr. Sanderson?
7    A  Yes.
8    Q  Okay.
9    A  I believe the Sanderson survey is an indication
10  and also the Hollander report is an indication,
11  Hollander, H-o-l-l-a-n-d-e-r.
12    THE VIDEOGRAPHER:  You guys have about five minutes
13  of this tape.
14    MR. STEWART:  Okay.
15    THE WITNESS:  A  Excuse me.
16        The -- Perzel would be specifically addressed
17  to Dr. Sanderson.  The Hollander report is specifically
18  addressed to Internet users who have purchased cosmetic
19  surgery services.
20    MR. STEWART:  Q  Okay.
21        Let's go to the next page of your report,
22  Page 11, and this is in Paragraph Number 11 of your
23  report.
24    A  Okay.

Page 169

1    Q  This paragraph is discussing the expert report
2  of James Dawes, D-a-w-e-s.
3        And on Page 11, you quote from his report in
4  which he states about cosmetic surgery, "These
5  procedures are often very private matters for patients."
6        Do you see that?
7    A  Yes.
8    Q  Did I read that correctly?
9    A  You did.
10    Q  Do you agree that these procedures are often
11  very private matters for patients?
12    A  Not having gone through it myself, I would think
13  so.
14    Q  Okay.
15        You then state, again, reading from his report,
16  Without the intranet (sic) and public websites, a
17  significant number of patients wouldn't pursue a
18  procedure due to the stigma associated with having
19  cosmetic procedure."
20        Did I read that correctly?
21    A  Yes.
22    Q  And then you say, There are no facts or data
23  cited in his report to support this conclusion.
24        Did I read that correctly?

Page 170

1    A   Yes.
2    Q   Do you have any facts or data one way or the
3  other on that subject?
4    A   I would say the Hollander report is probably
5  the -- as -- as good as any that you'll find where he
6  asks people the sources of information, and then he
7  weights them as to how important they are.
8    Q   And so would you agree that the Internet and
9  public websites, that -- that a significant number of
10  patients wouldn't pursue a procedure without the
11  Internet and public websites?
12    A   No.
13      I would simply say, as I said in my report,
14  there are no facts or data cited in Mr. Dawe's report to
15  support this conclusion.
16    Q   But you're not aware of any data to the contrary
17  though either, are you?
18    A   No.
19    Q   It's certainly possible then that Mr. Dawe's
20  conclusion is true?
21    A   Maybe yes.  Maybe no.
22    Q   All right.  Let's go forward to Paragraph 12 on
23  Page 12.  We started this topic already talking about
24  the forms.

Page 171

1      And is it your understanding that there was
2  more than one form at issue?
3    A   Yes.
4    Q   Have you seen all of the forms?
5    A   I have -- I haven't read -- I haven't reviewed
6  each and every one of them individually, but I have seen
7  the different categories of forms and reviewed some of
8  them.
9    Q   Yeah, yeah.  The different categories is all I
10  meant by that question.
11      We've talked about one of those three
12  categories already?
13    A   That's this one.
14    Q   Exhibit --
15    A   Exhibit 6.
16    Q   All right.  What -- What are the other surveys
17  or questionnaires?
18    A   One is a very detailed medical history-type
19  surv -- questionnaire, and the third one is one where a
20  diagram of the face is put on there, and there is a
21  question in that one as well that says essentially how
22  you heard of Dr. Sanderson.
23    MR. STEWART:  Do you want to take a break now?
24    THE VIDEOGRAPHER:  Sure.

Page 172

1    MR. SMELTZER:  Yeah, that's good.
2    THE VIDEOGRAPHER:  Ending Tape Number Ending Tape
3  Number 2 of the deposition of James T. Berger.
4      We're off the record at 2:15 p.m.
5        (Break taken.)
6    THE VIDEOGRAPHER:  Just a moment, please.
7      And we're beginning Tape Number 3 of the
8  deposition of James Berger.
9      We're back on the record at 2:22 p.m.
10        (Document marked.)
11    MR. STEWART:  Q  Mr. Berger, I'm handing you a
12  document that's been marked Exhibit 7 to your
13  deposition.
14      Do you recognize this document?
15    A   Yes.
16    Q   What is this?
17    A   That's the second form that I referred to.
18    Q   And the last line is where the referral
19  information would be recorded on this form, is that
20  right?
21    A   Yes.
22    Q   Do you have an understanding of who this form
23  was given to?
24    A   To patients.

Page 173

1    Q   To all patients of Dr. Sanderson?
2    A   I'm -- I'm assu -- I -- It says Eyelid & Facial
3  Plastic Surgery so I -- I would assume it's those
4  patients that are involved here.
5    Q   So is it your understanding that this is given
6  to less than all of the patients that come to see
7  Dr. Sanderson?
8    A   Yes.
9    Q   How about with regard to Exhibit 6?  Do you have
10  an -- any understanding about whether that form is given
11  to all of Dr. Sanderson's patients or not?
12    A   I really don't know.
13      I'm -- I'm -- I -- I'm assuming that it was
14  given to all of his patients.
15    Q   Which document are you referring to?
16    A   6.
17    Q   Okay.
18      And Exhibit 7, do you have an understanding of
19  when this chart would be filled out?
20    A   In the office as they've come in for an
21  appointment and they're probably filling it out the way
22  I always do when I go to a new doctor, at the time I sit
23  down and when asked various questions.
24    Q   So is your -- you're understanding that

Page 174

1  Exhibit 7 is filled out by the patient?
2     A   Yes.
3     Q   The last line where it says, Referred or
4  Recommended by, then it's got a blank line, underneath
5  that blank line it says, Name, Address and Phone Number.
6        Do you see that?
7     A   Yes.
8     Q   So this particular line asked the patient to
9  identify a referral or recommendation source by name,
10 address and phone number, correct?
11    A   It does.
12    Q   And so a patient who would be filling in this
13 line would assume that they are not being asked to fill
14 in information about other referral or recommendation
15 sources --
16    MR. SMELTZER:  Objection.
17    MR. STEWART:  Q -- correct?
18    MR. SMELTZER:  Objection as to form.
19    THE WITNESS:  A  Well, it would appear to be that
20 way, yes.
21    MR. STEWART:  Q  Now, you mentioned a third form,
22 and I think you said that was a patient chart?
23    A   It looks like there's a drawing of the patient's
24 face on there.

Page 175

1     Q   Okay.  I unfortunately do not have an extra copy
2  of this document.
3        What I'm going to do is -- is hand this to you.
4        It is, for purposes of the record, Exhibit 4 to
5  the Pat Perzel deposition from Tuesday of this week.
6        Actually, let me hand it to Rob first and see
7  if he's got any objection.  I -- I've got some notes on
8  there but nothing that matters.
9        Maybe we can get a clean copy at a break and
10 mark it as an exhibit.
11    MR. SMELTZER:  Let me just -- I've got a cleaner
12 one.  I don't know if you want to --
13    MR. STEWART:  If you've got a cleaner one, I'd --
14 I'd rather use that.
15    MR. SMELTZER:  Yeah.  It's got Exhibit 4 from Perzel
16 on the bottom, but you can use that if you want.
17    MR. STEWART:  Just mark that, if you would, put the
18 label over the Exhibit 4.
19        Is that okay?
20    MR. SMELTZER:  Yes.
21    MR. STEWART:  Correct.
22        (Document marked.)
23    MR. STEWART:  Q  Mr. Berger, I'm now handing you
24 Exhibit 8.

Page 176

1        Do you recognize this document?
2     A   Yes.
3     Q   Is that the patient chart you were referring to
4  earlier?
5     A   Yes.
6     Q   And where is referral information recorded on
7  this document?
8     A   It says Consult from.  It's right ab -- above
9  the picture of the -- the drawing of the face.
10    Q   Do you have an understanding of who completes
11 the information on this form?
12    A   I believe it's the -- the doctor or the nurse or
13 somebody.
14    Q   Is the identity of -- who completes this form
15 relevant in terms of understanding what's on the form?
16    A   Well, you know, that's a question I asked
17 Dr. Sanderson yesterday, and the fact of the matter is
18 that in the file are the other two forms so that he's
19 able to -- to compare the findings from this form as
20 opposed to Exhibit 6 and 7 so he might just very well
21 refer to one of the other forms and fill that in --
22    Q   Okay.
23    A   -- rather than ask the patient.
24    Q   Did you have any understanding of -- of who

Page 177

1  completes the information on these forms before your
2  discussion with Dr. Sanderson yesterday?
3     A   I felt the patient probably completed
4  Exhibit 6 and 7 himself, himself or herself, and
5  Exhibit 8 I felt was probably done by the professional.
6     Q   But you didn't know for certain?
7     A   No.
8     Q   And don't know for certain today?
9     A   No.
10    Q   And I think I asked this already.  I apologize
11 I -- if I did.  I don't remember the answer.
12        But where is the referral information recorded
13 on this form?
14    A   On No. 8, on Exhibit 8?
15    Q   Correct.
16    A   Yeah, you asked that.
17        It said Consult from.
18    Q   Okay.  And consult from would imply if -- if a
19 consultation from another physician, wouldn't it?
20    MR. SMELTZER:  Objection as to the foundation.
21    THE WITNESS:  A  Well, maybe.
22        In this particular sheet, it says Internet WOW.
23 I don't know what that means, but it's a coded thing.
24    I don't know.

Page 218

1  of each one of those.
2      And, in the first question, the number -- the
3  percentage was, I believe, 16 percent adjusted downward
4  to 14.2 who initially enlisted the Internet, and that to
5  me supports the concept of a -- of -- of a
6  high-involvement purchase that would rely primarily on
7  recommendations, person-to-person recommendations from
8  family, friends and -- and other physicians.
9      Q   Did you see Mr. Hollander's data on the degree
10  to which referrals from family and friends and other
11  physicians influenced the survey respondent's decision
12  to use a particular cosmetic surgeon?
13      MR. STEWART:  Object to form.
14      THE WITNESS:  A  Yes.
15      Both of those were well over 50 -- were --
16  were -- I don't know well over, but they were over 50
17  percent in his unweighted as compared to 16 percent in
18  the weighted versus the Internet.
19      MR. SMELTZER:  Q  And is that data consistent with
20  your opinion in Paragraph 9 of your report?
21      A   Yes.
22      MR. STEWART:  Object to form.
23      THE WITNESS:  A  Yes, it is.
24      In fact, I believe there is a -- if -- if -- if

Page 219

1  you properly weighted Hollander's numbers and compared
2  them with the Perzel tabulated data, you would find
3  some -- some on -- some -- some consistency there.
4      THE REPORTER:  Some --
5      THE WITNESS:  Some consistency, a level of
6  consistency.
7      MR. SMELTZER:  Q  On Page 12 of your report, which
8  is Exhibit No. 1, you say, This proves conclusively that
9  the Internet was not the driving force that caused
10  people to be attracted to Dr. Sanderson's practice.
11      My question is, is it also your opinion that
12  the Internet was not a driving force causing people to
13  be attracted to Dr. Sanderson's practice?
14      A   Yes.
15      Q   And is that based on your understanding of
16  consumer behavior and high-involvement purchasing
17  decisions?
18      A   Yes.
19      It makes a lot of sense based on that
20  rationale.
21      Q   And does Ms. Perzel's data also support your
22  opinion in that regard?
23      A   Very much so.
24      Q   And does Mr. Hollander's opinion that only

Page 220

1  16 percent weighted down to 14 some odd percent of his
2  survey respondents mention the website as an influence
3  support your opinion in that regard?
4      A   Yes.
5      Q   Do you have any reason to believe that
6  Ms. Perzel's report or data is not accurate in any way?
7      A   No, I do not.
8      MR. SMELTZER:  That's all the questions I have.
9      MR. STEWART:  I've got a couple of follow-up
10  questions.
11          FURTHER EXAMINATION
12          by Mr. Stewart:
13      Q   Exhibit 6 to your deposition is the form that
14  patients fill out for Dr. Sanderson.
15      You would agree with me, with you -- wouldn't
16  you, that if -- if a patient heard about Dr. Sanderson's
17  website after completing this form that they would not
18  reflect that on this form?
19      A   Correct.
20      Q   And that it could be that there are in fact
21  patients of Dr. Sanderson who heard about his website
22  after completing what's Exhibit 6?
23      A   I agree with that.
24      Q   And you don't have any way of knowing how many

Page 221

1  people that is, do you?
2      A   No, I wouldn't.
3      Q   I want to go to the charts that Ms. Perzel gave
4  you, and these are attached as a -- a part of Exhibit B,
5  and you were asked by Mr. Smeltzer whether these charts
6  indicated people identifying more than one referral
7  source, is that right?
8      MR. SMELTZER:  I'll object to the form.
9      THE WITNESS:  A  I thought they did.
10      Maybe I was wrong.
11      MR. STEWART:  Q  Take a look through there, and let
12  me ask you a slightly different question.
13      You would agree with me, wouldn't you, that the
14  vast majority of the respondents only identi -- only
15  identified one or no sources?
16      MR. SMELTZER:  I'll object to the form.
17      THE WITNESS:  A  Yes, it appears that way.
18      But there are some -- there are some -- more
19  than one in some -- in -- in -- in -- in a lot of cases.
20      MR. STEWART:  Q  There are many patients who didn't
21  identify any referral source, is that correct?
22      A   Yes.
23      Q   For the patients who identified only one
24  referral source, is it possible that those people could

### Page 222

1  have understood that they were only supposed to identify
2  one?
3    A  I -- I wouldn't know.
4    Q  And it's possible, isn't it, that among the
5  patients who did not provide any referral source that
6  they could have visited Dr. Sanderson's website?
7    A  Is it possible that they could have?
8       It's possible they could have.
9    Q  And it's possible also, isn't it, that that
10 could have been how they heard about Dr. Sanderson?
11   A  Unlikely.
12   Q  Why is that?
13   A  Because they would have volunteered it when --
14 when given the opportunity.
15   Q  Would you agree that they had to have found out
16 about Dr. Sanderson's practice from some source?
17   A  I -- I have to believe they didn't just walk in
18 from the street.
19   Q  And so then wouldn't you expect that they would
20 have given some response in response to the first
21 question in Exhibit 6?
22   A  Yeah, I think I would have expected they would
23 have given some response.
24   Q  So they were referred by some source in their

### Page 223

1  question as an other category.
2       So doesn't the absence of a response just
3  indicate that that patient chose not to provide any
4  response?
5    A  Well, wait a minute.  I'm -- I'm sorry.  I'm
6  going to -- I'm going to backtrack a little bit.
7       You see in all -- there -- there is really
8  on -- on virtually all of them, there is a source even
9  though it -- even -- even there's a referral for
10 marketing and referral from doctors, and virtually
11 everyone is referred from either one or the other.
12   Q  All right.  Turn with me to Page 65 of the
13 materials you got from Ms. Perzel.  It bears a page
14 number at the bottom.
15   A  Sixty-five?
16      Oh, here we are.
17 MR. SMELTZER:  I'm sorry, Dave.  What was that?
18 MR. STEWART:  Page 65.
19 MR. SMELTZER:  Of the Attachment 5?
20 MR. STEWART:  Yes.
21 THE WITNESS:  A  We're getting there.
22      Sixty-four, 65.
23 MR. STEWART:  Q  All right.  Now, I -- this is just
24 where I happened to be when I was flipping through this

### Page 224

1  document so there's nothing particularly special about
2  this page, but it appears to me that by reviewing this
3  the patient -- the patient that is identified by Chart
4  Number 1828 did not provide a response?
5    A  Yes.
6    Q  1829 did not provide any referral response?
7    A  I see that.
8    Q  1832 did not?
9    A  That's right.
10   Q  1835 cannot?
11   A  Yes.
12   Q  1836 did not, 1837 did not?
13   A  Nope.
14   Q  1839 did not?
15   A  1838 did not.
16      1839 did.
17   Q  1838, okay.
18      1845 did not?
19   A  That's right.
20   Q  1847 did not?
21   A  Correct.
22   Q  1852 did not?
23   A  Right.
24   Q  1855 did not?

### Page 225

1    A  That's right.
2    Q  Does that change your opinion about how many
3  people filled in one or of other of the source?
4    A  No.
5       But most of the people did fill in one or the
6  other.
7       I -- I -- I can see that a lot of people
8  didn't, but most of them did.
9    Q  And all the people who didn't, you'll agree with
10 me, I think, from what you said a minute ago, had to
11 have heard about Dr. Sunder -- Sanderson from some
12 source?
13   A  I would agree with that.
14   Q  And so their failure to complete any information
15 in the first section of Exhibit 6, doesn't that just
16 indicate that they chose not to complete that
17 information?
18   A  That's correct.
19   Q  And those people though could have heard about
20 Dr. Sanderson from the website who chose not to respond?
21   A  Could have heard it from any -- any source.
22   Q  And the website is one of those sources?
23   A  Yes, that's correct.
24   Q  Now, you said a minute ago that your conclusion

57  (Pages 222 to 225)

Page 226

1  is that the Internet is not a "driving force", for
2  patients to see Dr. Sanderson?  Is that what you said?
3      A  Yes.
4          Based on the information that was given in the
5  Perzel compilation, I would say that 1.3 percent does
6  not constitute a driving force.
7      Q  Okay.  And -- And -- And we're agreed though, I
8  believe, that that survey does not ask the question what
9  influenced your decision to use Dr. Sanderson?
10     A  Well, the survey says, how did you hear of
11 Dr. Sanderson.
12     Q  And that's a different question, isn't it, it
13 measures a different issue?
14     A  That's right.
15     Q  Okay.  So based upon the results of those
16 surveys, you really can't conclude from that
17 information, can you, what influenced their decision to
18 use Dr. Sanderson as a surgeon?
19     A  No.
20         I can only conclude how they heard about
21 Dr. Sanderson.
22     MR. STEWART:  Okay.  I have no further questions.
23     MR. SMELTZER:  Just one follow-up.
24

Page 227

1          FURTHER EXAMINATION
2          by Mr. Smeltzer:
3      Q  If Exhibit No. -- If a patient doesn't give a
4  response to Exhibit No. 6, do we have any basis to
5  conclude that the website was a factor in that patient's
6  decision to select Dr. Sanderson?
7      A  None whatsoever.
8      MR. SMELTZER:  Okay.  That's all I have.
9      MR. STEWART:  Okay.
10     THE VIDEOGRAPHER:  This concludes the --
11     THE WITNESS:  Are we done?
12     THE VIDEOGRAPHER:  This con --
13     MR. STEWART:  Do you want to reserve --
14     MR. SMELTZER:  Yeah.
15     MR. STEWART:  -- signature?
16     THE VIDEOGRAPHER:  This concludes the deposition of
17 James Berger.
18         We're off the record at 4:04 p.m.
19         Thank you.
20
21         - - - - -
22
23
24

Page 228

1  STATE OF ILLINOIS )
                       ) Ss:
2  COUNTY OF COOK )
3
4          The within and foregoing deposition of the
5  aforementioned witness was taken before ROBBIN M.
6  OCHENKOWSKI, C.S.R., and Notary Public, at the place,
7  date and time aforementioned.
8          There were present during the taking of the
9  deposition the previously named counsel.
10         The said witness was first duly sworn and was
11 then examined upon oral interrogatories; the questions
12 and answers were taken down in shorthand by the
13 undersigned, acting as stenographer and Notary Public;
14 and the within and foregoing is a true, accurate and
15 complete record of all of the questions asked of and
16 answers made by the aforementioned witness, at the time
17 and place hereinabove referred to.
18         The signature of the witness was not waived,
19 and the deposition was submitted, pursuant to
20 Rules 30(e) and 32(d) of the Rules of Civil Procedure
21 for the United States District Court, to the deponent
22 per copy of the attached letter.
23         The undersigned is not interested in the within
24 case, nor of kin or counsel to any of the parties.

Page 229

1          Witness my official signature and seal as
2  Notary Public in and for Cook County, Illinois, on this
3  _____ day of _____, A.D., 2007.
4
5
6
7
8
        _____
9       ROBBIN M. OCHENKOWSKI, C.S.R.
        C.S.R. No. 084-002522
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24